### KENTUCKY BAR ASSOCIATION, Movant

### v.

### UNNAMED ATTORNEY, Respondent.

### No. 2012–SC–000388–KB.

Supreme Court of Kentucky.

Dec. 19, 2013.

## OPINION AND ORDER

During the course of Unnamed Attorney's[1] representation of a fellow attorney in a disciplinary matter, Unnamed Attorney negotiated a settlement between his client and the complaining party. The terms of the negotiated settlement have now resulted in charges of professional misconduct against Unnamed Attorney because the terms of the settlement agreement required the complaining party to refuse to cooperate voluntarily with the Kentucky Bar Association in any investigation into the matter. The Trial Commissioner adjudged Unnamed Attorney guilty of professional misconduct for entering into such an agreement with a witness, but the KBA Board of Governors overturned that determination on appeal. Neither party has appealed to this Court, but we exercise our discretion under SCR 3.370(8) and notice review. We now reverse, in part, and affirm, in part, the decision of the Board of Governors. In so doing, we find Unnamed Attorney guilty of violating SCR 3.130–3.4(g) but not guilty of violating SCR 3.130–3.4(a).

## I. FACTUAL AND PROCEDURAL BACKGROUND.

The material facts of this case are undisputed. Unnamed Attorney agreed to represent a fellow attorney in a disciplinary matter filed by one of the fellow attorney's former clients, Jane Doe.[2] Doe alleged the client of Unnamed Attorney overcharged for his handling of a probate matter.

Eventually, Doe's dissatisfaction with what she perceived to be little work for great expense led her to terminate employment of Unnamed Attorney's client and hire a new attorney.

At some point after terminating the employment of Unnamed Attorney's client, Doe filed a bar complaint against Unnamed Attorney's client. During the initial stages of the complaint proceedings, Unnamed Attorney arranged a meeting between Doe and the Unnamed Attorney's client to discuss a possible settlement. Unnamed Attorney notified the Office of Bar Counsel, the prosecutorial agency in the disciplinary matter, of the meeting and potential settlement. In April of 2010, as a result of Unnamed Attorney's negotiations, Doe agreed to settle the dispute. The terms of the settlement required Unnamed Attorney's client to refund a $30,000 fee in return for Doe's withdrawal of her bar complaint. Specifically, paragraph 4 of the settlement agreement stated:

> Withdrawal of Bar Complaint. [Jane Doe] agrees to take all action legally necessary to immediately withdrawal [sic] of the Bar Complaint and agrees to the extent permitted by law, to refuse to voluntarily assist or to voluntarily provide information to the KBA or anyone else, regarding the Bar Complaint unless directed to do so pursuant to subpoena, court order or other binding authority.

At the request of Doe, Unnamed Attorney provided a copy of the agreement to Doe's attorney for his review. Doe's attorney reviewed the agreement, suggested minor changes, and recommended Doe sign the agreement.

Unnamed Attorney's client paid the $30,000. Later, Unnamed Attorney com-

---

[1]. Admitted to practice law in Kentucky.

[2]. Jane Doe is a pseudonym to protect the identity of those involved.

plied with the OBC's request for a copy of the settlement agreement. The Inquiry Commission ultimately issued a Charge against Unnamed Attorney alleging he violated: (1) SCR 3.130–3.4(a),[3] "by unlawfully obstructing another party's access to evidence, or by counseling or ordering another to do so, as evidenced by paragraph 4 of the Release Agreement"; and (2) SCR 3.130–3.4(g),[4] "by requesting that a person, ..., who was not Respondent's client, refrain from voluntarily giving relevant information to another party as evidenced by paragraph 4 of the Release Agreement."

After a hearing, the Trial Commissioner found Unnamed Attorney guilty of both charges and recommended Unnamed Attorney receive a public reprimand and be suspended from the practice of law for thirty days. Unnamed Attorney appealed the decision to the Board of Governors. The Board of Governors, after conducting its own de novo review of the matter, concluded Unnamed Attorney was not guilty of either charge, by a 16–0 and 12–4 vote, respectively. We exercised our authority under SCR 3.370(8) and took review of the case. We now reverse the Board of Governors, in part.

## II. ANALYSIS.

### A. Unnamed Attorney did not Violate SCR 3.130–3.4(a).

■ As mentioned previously, SCR 3.130–3.4(a) prohibits a lawyer from *un-*

*lawfully* obstructing another party's access to evidence. Although the Trial Commissioner concluded that Unnamed Attorney had obstructed the KBA's access to evidence by committing the unlawful act of "fraud," no statute or case law was cited in support of this assertion. We have failed to identify any Kentucky statute under which Unnamed Attorney's actions could be considered fraudulent. As a result, we must look to our common-law definition of fraud for guidance.

In Kentucky, to make a prima facie claim of fraud, a party must, by clear and convincing evidence, satisfy six elements: "a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury."[5] These requirements are clearly lacking in this case.

During the negotiation, Unnamed Attorney asked Doe, outside of the presence of Unnamed Attorney's client: "What would you accept?" Doe responded, "$30,000." Unnamed Attorney took that information to his client who agreed to reimburse the $30,000 and the negotiation ended. After Unnamed Attorney's client reimbursed the estate, Doe signed the release. There was no false representation, and Doe suffered no injury. Rather, Unnamed Attorney obtained Doe's signature on the release agreement by successfully negotiating a

---

3. SCR 3.130–3.4(a) reads, "A lawyer shall not: (a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act."

4. SCR 3.130–3.4(g) reads, "A lawyer shall not: request a person other than a client to refrain from voluntarily giving relevant information to another party unless:

(1) the person is a relative or agent who supervises, directs or regularly consults with the client concerning the matter or has authority to obligate the client with respect to the matter;

(2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information."

5. *United Parcel Serv. v. Rickert,* 996 S.W.2d 464, 468 (Ky.1999).

settlement in which Doe received everything she asked for. Doe was represented by counsel who advised her to accept the settlement and to sign the release agreement. Accordingly, we adopt the recommendation of the Board of Governors and find Unnamed Attorney not guilty of violating SCR 3.130–3.4(a).

**B. Unnamed Attorney Violated SCR 3.130–3.4(g).**

*1. The Trial Commissioner did not Err in Excluding Professor Fortune's "Expert" Testimony.*

■ Initially, we feel it worthwhile to discuss an important point raised primarily by the KBA's brief. At the underlying hearing in this case, Unnamed Attorney offered Professor William Fortune to testify as an expert. The Trial Commissioner, finding that it needed no expert help in reading and applying the applicable disciplinary rule, did not allow Professor Fortune's testimony. Unnamed Attorney properly preserved Professor Fortune's testimony in the record via an offer of proof.[6] Indeed, Professor Fortune's testimony was paramount in attempting to convince the Trial Commissioner to construe the rule in a manner that would result in finding Unnamed Attorney not guilty. As a result, Unnamed Attorney has previously argued the Trial Commissioner acted erroneously in excluding the testimony. The KBA now argues there was no error. We agree with the KBA.

It is well settled that the Kentucky Rules of Evidence are applicable in KBA proceedings.[7] KRE 702 specifies that "[i]f scientific, technical, or otherwise specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify." In reviewing a trial court's, in this case the Trial Commissioner's, decision to prohibit expert testimony, we look for an abuse of discretion.[8] An abuse of discretion is only found when the "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[9] Using this standard, we cannot say that the Trial Commissioner's decision in this case was an abuse of discretion.

The KBA and OBC, as agents of this Court, are charged with applying, and often interpreting, the Rules of Professional Conduct. This case is no different. Here, the Trial Commissioner was faced with a seemingly novel application of a rule adopted during "Ethics 2000," the recent overhaul of our ethics rules. We fail to see how a Trial Commissioner choosing to interpret a particular rule without the aid of a proffered expert is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." We would not require a court to allow testimony of a grammar expert in the interpretation of a statute, and we see no reason to require a Trial Commissioner to do so here. And we should not foist such a requirement on triers of fact simply because we find the excluded evidence or testimony alluring.

It is indisputable that Professor Fortune is a highly respected authority in the field of legal ethics, and he was asked by this Court to play a vital role in the process of adopting Ethics 2000. In dissent, Justice

---

6. *See* Kentucky Rules of Evidence (KRE) 103(a)(2).

7. SCR 3.340 ("The rules of evidence applicable in civil proceedings shall apply, and the Trial Commissioner will rule on all evidentiary issues.").

8. *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 577–78 (Ky.2000).

9. *Id.* at 581.

Scott relies heavily on Professor Fortune's singular expertise on our Rules of Professional Conduct. But that alone cannot be sufficient reason for a finding of abuse of discretion in a trier of fact's decision to exclude expert testimony. Taking the dissent's reasoning to its logical conclusion renders the abuse of discretion standard meaningless and indicates KRE 702 *requires* a judge to allow expert testimony when a party proffers a prominent expert, regardless of the subject. Simply put, Professor Fortune's testimony was enlightening, but it was not mandatory, especially given the subject matter. The Trial Commissioner, as an attorney, is adequately equipped to apply the Rules of Professional Conduct. And, furthermore, the Trial Commissioner is entrusted with adequate discretion to decide whether an expert will be helpful. We find no abuse of that discretion and, accordingly, do not make mention of Professor Fortune's testimony in deciding the instant case.

### 2. The Plain Language of SCR 3.130–3.4(g) Proves Unnamed Attorney's Guilt.

■ We now turn to the question of whether or not Unnamed Attorney violated SCR 3.130–3.4(g). SCR 3.130–3.4(g) provides,

A lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information to another party unless:

(1) the person is a relative or agent who supervises, directs or regularly consults with the client concerning the matter or has authority to obligate the client with respect to the matter;

(2) the lawyer reasonably believes that the person's interests will not be

adversely affected by refraining from giving such information.

The structure of the rule immediately presents a concern—that is, notably, whether 3.4(g)(1) and 3.4(g)(2) are to be read in the conjunctive or disjunctive. Curiously, the rule is written in a manner that does not indicate how it should be read. The semicolon after –3.4(g)(1) is followed by neither "and" nor "or." Before we can accurately or fairly determine if an attorney has violated a rule, we must first determine what the rule requires.[10]

■ We believe it is clear that –3.4(g)(1) and (2) are to be read in the conjunctive. Accordingly, an attorney can request a person other than a client to refrain from voluntarily giving relevant information to another party only if the person "is a relative or agent who supervises, directs or regularly consults with the client concerning the matter or has authority to obligate the client with respect to the matter" *and* "the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information." This interpretation is supported by the manifest weight of the relevant evidence and commentary.

Our Rules of Professional Conduct are modeled after the American Bar Association's (ABA) Model Rules of Professional Conduct (MRPC). Notably, MRPC 3.4(f), the model for our 3.4(g), reads as follows:

A lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information to another party unless:

(1) the person is a relative or an employee or other agent of a client; *and*

---

10. Effective January 1, 2014, SCR 3.130–3.4(g) includes "and" following the semi-colon between paragraphs (1) and (2). However, we must interpret the rule as it read during the action against Unnamed Attorney.

(2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information. (emphasis added).

It is telling and highly persuasive that the ABA's Model Rules include "and." So by the ABA's Model Rules, a lawyer is only permitted to request a person other than a client to refrain from volunteering relevant information to another party if *both* subparts are satisfied. Of course, our reliance on and adoption of the ABA Model Rules makes the omission of "and" in our –3.4(g) even more curious. Nonetheless, it is undeniable that the language of the ABA Model Rules is highly persuasive.

In addition, the Commentary to –3.4(g) clearly indicates that sections (1) and (2) should be read in the conjunctive. Comment 4, particularly, sheds light on this topic:

> Paragraph (g) permits a lawyer to request relatives or employees or other agents of a client to refrain from giving information to another party. Such persons may identify their interests with those of the client.... The lawyer must reasonably believe that the person's interests will not be adversely affected by compliance with the request. The Rule does not require that the lawyer know or ascertain the person's interest, but any such knowledge, communication, or other information available to the lawyer may suggest that such a belief is reasonable....

This Comment provides a strong implication that the rule is to be read in the conjunctive. Importantly, the Comment speaks seamlessly about persons other than clients being requested to refrain from giving information, *i.e.* –3.4(g)(1), and those persons' interests, *i.e.* –3.4(g)(2). It is our opinion that "and," while omitted, was certainly intended to be included in –3.4(g).

Under this interpretation, Unnamed Attorney is guilty of violating SCR 3.130–3.4(g). Unnamed Attorney negotiated a deal in which Unnamed Attorney's client agreed to refund the $30,000 fee in return for Doe's agreement to withdraw her bar complaint and to refuse to cooperate voluntarily with the KBA. It is indisputable that Doe was not Unnamed Attorney's client, nor was she "a relative or agent who supervises, directs or regularly consults with the client concerning the matter or has authority to obligate the client with respect to the matter." So Unnamed Attorney cannot meet the requirement of SCR 3.130–3.4(g)(1). Accordingly, because –3.4(g)(1) and (2) are read in the conjunctive, Unnamed Attorney cannot satisfy the exception to the general rule prohibiting a lawyer from "request[ing] a person other than a client to refrain from voluntarily giving relevant information to another party[.]" The plain language of the rule mandates this result. And when we engage in interpretation, it is a fundamental principle that when the language is unambiguous, we will apply it straightforwardly.[11] There is no need to engage in the imprecise debate of what was intended with our passage of the rule because the language is certain. Unnamed Attorney must be found guilty under the plain language of SCR 3.130–3.4(g).

---

**11.** *See, e.g., MPM Financial Group, Inc. v. Morton,* 289 S.W.3d 193, 197 (Ky.2009); *King Drugs, Inc. v. Commonwealth,* 250 S.W.3d 643, 645 (Ky.2008) ("[I]f a plain reading of the statute yields a reasonable legislative intent, then that reading is decisive and must be given effect."); *Commonwealth v. Steve Plowman,* 86 S.W.3d 47, 49 (Ky.2002) ("This Court has repeatedly held that statutes must be given their literal interpretation unless they are ambiguous and if the words are not ambiguous, no statutory construction is required.").

## III.  CONCLUSION.

We cannot place our imprimatur on settlements that attempt to obstruct the disciplinary process in any way.  And it is clear the plain language of the rule requires a finding of guilt in this case.  Certainly, Unnamed Attorney's actions were not of a highly objectionable nature as undoubtedly many attorneys may engage in similar conduct outside the disciplinary context.  Weighing this accordingly, we find a private reprimand is an appropriate sanction.

For the foregoing reasons, the Court ORDERS:

1) Unnamed Attorney is guilty of violating SCR 3.130–3.4(g);

2) Unnamed Attorney is not guilty of violating SCR 3.130–3.4(a); and

3) Unnamed Attorney is hereby privately reprimanded.

All sitting.  MINTON, C.J.; KELLER, NOBLE, and VENTERS, JJ., concur.  ABRAMSON, J., concurs by separate opinion.  SCOTT, J., concurs, in part, and dissents, in part, by separate opinion in which CUNNINGHAM, J., joins.

ABRAMSON, J., concurring:

I concur but write separately to explain my reasoning.  At adoption of this rule, I focused on the use of the words "another party" as meaning someone with whom the person being asked by the lawyer to refrain from voluntary cooperation was in active litigation, *i.e.*, another party to the proceeding for which the request was made.  I see that it can and does have broader application, as currently written, and do not have any hesitancy in applying it to this situation.  Doe was the initiating party of the KBA complaint, although not technically a named party, and the client of

Unnamed Attorney was the respondent.  Unnamed Attorney's request, on his client's behalf, was a request to a party in the KBA proceeding to refrain from voluntary cooperation.  Although our rules would allow for the subpoena of relevant information for "good cause" shown, SCR 3.180, we should not condone a practice that would make the disciplinary process more difficult, nor should we encourage a practice that allows attorneys to attempt to buy their way out of their misdeeds by silencing a party who has initiated a KBA complaint.  As for the broader application of this rule in other contexts, I think this case and the issues it has raised establish the need for further evaluation of the rule by this Court.

SCOTT, J., concurring in part and dissenting in part:

Although I agree with the majority's points that Unnamed Attorney did not violate SCR 3.130–3.4(a) and that SCR 3.130–3.4(g) should be read to include the conjunctive "and" between subsections (1) and (2), I must strongly disagree with the majority's extension of SCR 3.130–3.4(g) to settlements.

Moreover, given Professor William Fortune's unique role with this Court in its consideration of –3.4(g) (and the rest of the voluminous "Ethics 2000" rule changes), his heading up of the KBA Rules Hearing for the Court and explaining the meaning of the "Ethics 2000" rules, and his subsequent leadership role in explaining the rules to the Kentucky Bar during the. Kentucky Law Updates, I believe it *was* an abuse of discretion, in this instance, for the trial commissioner to have disallowed Professor Fortune's testimony.  In this rare and unique instance, it would not have hurt for the commissioner to have listened to the "leader of the parade." [12]

---

**12.**  That is not to say that he had to accept it, but it did give the context surrounding the

Thus, I will first address the majority's exclusion of Professor Fortune's testimony regarding how the particular Rule at issue was formulated and should be interpreted and applied.

Admittedly, KRE 702 provides that an expert witness may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." And, typically, as the finder of fact in KBA actions is the trial commissioner, under normal circumstances, expert testimony on the legal meaning of a rule would not be necessary. Yet, the circumstances here were very different.

In this case, the opinions of Professor Fortune were relied on heavily by this Court—and the Bar—in the "Ethics 2000" [13,14] rule-making process SCR 3.130–3.4g was a part of. Here with his in-depth knowledge of these rules and their history, context, and intent, Professor Fortune helped this Court and the Bar come to a better understanding of the rules' meanings *before* they were adopted. The problem we must grapple with now is that the meaning of –3.4(g), as interpreted by the majority, is not the one we thought it was. Thus, there is a matter of equity at play here, too.

Thus, in this very unique and particular instance, I believe it *was error* to exclude the testimony of Professor Fortune, as his testimony and recollection was necessary for a full understanding of the rule as presented—and *how* it was presented—in the "Ethics 2000" rule hearing as well as the later adoptive process. Plainly, this Court relied heavily on Professor Fortune in the formulation of these rules—and even relied on him to "sell" the changes to the bar. Yet, the majority now feels it would have been improper for the trial commissioner to have listened to the very person this Court entrusted to explain its meaning.

Next, I will address the majority's analysis of SCR 3.130–3.4(g). As previously stated, I agree that the majority correctly reads the rule in the conjunctive. However, I do not agree that Unnamed Attorney is guilty under this construction. Unnamed Attorney argued to the Board of Governors—and I agree—that –3.4(g) was not intended to apply to confidentiality and non-cooperation provisions in the *context of settlement agreements;* and had it been so intended, no reasonable notice was given to the attorneys in Kentucky indicating that it would be so applied. Because confidentiality and non-cooperation provisions are customary in settlement agreements, applying this rule to those agreements (which by nature restrict the free flow of discoverable information) will have unintended effects.

Suppose, for example, that one plaintiff in a tort action with national implications wants to settle her case. The defense presents her with an agreeable settlement offer and she signs a settlement agreement that includes a confidentiality provi-

adoption of this rule.

**13.** "Ethics 2000" was a massive undertaking to make material changes to the ethics rules of the Kentucky Supreme Court. The process was lengthy, and the proposed changes did not become available for comment until 2008. The final version of the changes went into effect in July of 2009.

**14.** The "Ethics 2000" rules changes were so massive, it is not an exaggeration to describe Professor Fortune as having been not only the Court's advisor on the implementation of the Ethics 2000 rules vetting process, but also the Court's salesman for the changes to the Kentucky bar. It is for this reason that this is indeed a very unusual case involving the applicability of expert testimony as to the intended scope of a particular rule.

sion which prohibits her and her attorney from voluntarily disclosing the terms of the settlement to other plaintiffs, as well as the evidence discovered in the action, and requires the return of all discovered documents and their copies. Under the interpretation advanced today, the defense attorney who proposed the settlement agreement would be subject to discipline.[15] Thus, given the ubiquitous nature of confidentiality and non-cooperation provisions in settlement agreements of this type, I begin with the assumption that –3.4(g) was *not* intended to apply to them. And this was the way –3.4(g) was presented.

This position is supported by the avowal testimony of Professor Fortune in the proceedings below.[16] Although substantial in volume, I find Professor Fortune's testimony highly relevant to my point and therefore reproduce it below:

> [Question]: Professor Fortune ... [b]ased upon your training and experience and the qualifications that you have previously espoused and as contained in your résumé, do you believe that –3.4(g) was intended to apply to a settlement where the language suggests or requires the parties to the settlement to not supply information to a third party?
>
> [Professor Fortune]: No. . . .

ABA [Model Rule] 3.4(f) [from which SCR 3.130–3.4(g) was modeled] is a rule that the ABA promulgated to deal with a situation in which lawyers instruct witnesses not to cooperate with the other side, particularly acute in criminal cases, defense counsel often suspects the prosecutor of telling prosecution witnesses not to talk to defense counsel. Prosecutors often suspect defense counsel of the same thing.

So the rule was structured in such a way to say you can't put the witnesses— unless they are employees or relatives— you can't put the witnesses out of bounds to the other side by instructing them not to cooperate. And that's the context in which that rule has always, to my knowledge, been applied.[17]

I find no authority for the proposition that that rule, as promulgated by the ABA, and certainly as adopted by the Supreme Court of Kentucky, was intended to apply to provisions in a settlement between parties, in this case [Unnamed Attorney]'s client and the Complainant, in which money is paid and a condition of that payment is, as in this case, confidentiality and a dismissal of a complaint.

I find no authority for that proposition, and the reasons that I do not think

15. Such a complaint would not come from the settling plaintiff, but from the next plaintiff who faces such a denial or lack of access due to the original settlement agreement.

16. Professor Fortune teaches Professional Responsibility (among other courses) at the University of Kentucky College of Law. He is a past member of the Kentucky Bar Association committee on the Model Rules of Professional Conduct and helped with the drafting and implementation of the Rules; a past member of the KBA Ethics and Professionalism committee; co-author of *Modern Litigation and Professional Responsibility Handbook: The Limits of Zealous Advocacy* (2d ed., Aspen 2000); author of several articles on the topic of legal ethics and professional responsibility; and has testified as an expert witness in several cases involving alleged professional misconduct.

17. This is consistent with our decision in *Radford v. Lovelace*, 212 S.W.3d 72, 83 (Ky.2006) overruled on other grounds by *Cardine v. Commonwealth*, 283 S.W.3d 641 (Ky.2009). ("The evidence is in line with the case law of other jurisdictions in which the courts have held that unless the contact with the witness wrongfully threatens or prejudices the other side's ability of discovery, preparation, or presentation, there is no violation."). *Lovelace* dealt with a perceived interference with witnesses in a criminal investigation.

that our Supreme Court intended that are manifold. First, that the rule while on its face could be deemed to apply, the context in which this rule is applied is always one in which the people who are being advised or people who are being told not to cooperate are characterized as witnesses, telling a witness not to cooperate with the other side. It's never been described, that I can find, in the context of requiring a party to a settlement not to cooperate with a disciplinary authority.

So the context in which this rule was presented to the Court is one in which the entire background, if you will, was one involving witnesses to an event. There's nothing in the Ethics 2000 Committee report that indicates that the drafters of the committee contemplated that this would be pro—would be applied to settlements.

I didn't think of it as applied to settlements, so in the presentations I made to members of the Bar [at the 2007 and 2009 Kentucky Law Updates and as Chair of a hearing at the 200[8] Kentucky Bar Convention, among other events], I didn't say anything about settlements. I described the obvious situation where the question is whether or not you're telling a witness not to cooperate or simply informing them that they have a right not to talk, and that's the—that's been the rub in these cases.

Furthermore, and I really stress this, I believe that at that public hearing where members of the [Supreme Court Rules] [C]ommittee were present and I stimulated discussion of this particular rule, that if the members of the committee had contemplated that this rule would ever be applied to provisions in a settlement, they would have spoken up, because application of this rule to provisions in a settlement implicates not only noncooperation agreements, it implicates confidentiality agreements as well.

And if what was intended was to, in effect, say that if you're settling a civil case that you cannot impose upon—in most instances, the plaintiff—a confidentiality agreement, if the effect of that is to shut the plaintiff up in communicating with plaintiffs who are similarly situated, I would suggest to you that there are probably confidentiality agreements being drafted today which would violate this rule as the Bar Counsel is interpreting it.

And so I think the ramifications of application of this rule to provisions in a settlement in a civil case are very far reaching, and there's been no notices to the Bar that that is the position of Bar Counsel.

I think that there is an argument that perhaps confidentiality agreements, noncooperation agreements, and so on, should be impermissible, but if that's the argument, let it come in the form of a Supreme Court Rule with an opportunity for comment, because it's just fundamentally unfair to lawyers who are settling civil cases to have this trap sitting out there for them.

So I feel strongly that this is something that needs to come before the Court, and it needs to come before the Court prospectively, not in an appeal from an ethics matter.

In other words, that the—and if Bar Counsel feels strongly about this—that they ought to make the suggestion to the Court that you take this up and that you have a rule which speaks specifically on the matter, but not to do it in the context of disciplining a lawyer.

Also informative is a report prepared by Professor Fortune summarizing his interpretation of SCR 3.130–3.4(g). That report provides, in relevant part:

While it is for the Supreme Court to say what the rule means, the legislative history and secondary authorities do not support the proposition that the rule was intended to apply to non-cooperation agreements contained in settlements.

1) While the language of the rule refers to requesting *persons* to refrain from giving information, the focus of the rule has always been on requesting *witnesses*—non-parties—to refrain from giving information to the opposing party. The rule does not put lawyers on notice that it applies to a provision in a settlement agreement that the *parties* not voluntarily provide information to a disciplinary authority.

2) There is nothing in the Ethics 2000 report that indicates that the committee contemplated that the rule would apply to a settlement. Those dissenting from the adoption of the ABA rule use the word "witnesses" in describing the proposed application of the rule.

3) I chaired the Supreme Court's public meeting at the 2008 Bar Convention. Because there was a dissent in the committee report, there was considerable discussion of proposed rule 3.[4](g). A representative of the majority spoke in favor and a representative of the dissenters spoke against; there were comments from the floor; and there was no spoken recognition that the rule, if interpreted literally, might be applied to provisions in settlements. The debate at the convention centered on the difficulty in distinguishing between requesting a witness not to cooperate with the opposing party and informing the witness that the witness need not cooperate with the opposing party. It is my opinion that the drafters

of Rule 3.[4](g) did not intend the rule to be applicable to settlements. They were present at the public hearing and would have spoken up to inform the bar, had that been their intent.

4) There is nothing in the leading secondary authorities to support the proposition that ABA Model Rule 3.4(f) (and the state rules based thereon) applies to provisions in settlements. In Hazard and Hodes, The Law of Lawyering, the applicable section (30.12) is titled "Advising a Witness Not to Speak to Opposing Parties." In the ABA/BNA Lawyers' Manual on Professional Conduct, the section is titled "Dealing with Witnesses," the text stating that "Except in that limited situation, it is improper to request that a witness not talk to counsel for the opposing party." (61:715).

See also Restatement of the Law of Lawyering, sec. 116. There is nothing in the text or examples in these authorities that indicates that the authors contemplated that the rule would be applied to a provision in a settlement agreement.

5) An all-states [W]estlaw search . . . yields only one case in which a state's version of 3.4(f) was applied to a settlement provision; in that case the lawyer being disciplined was the defendant in a civil case brought by the client. *In re Walsh*, 286 Kan. 235, 182 P.3d 1218 (Kan.2008) . . . .

6) Application of 3.4(g) to settlements potentially affects confidentiality agreements. A confidentiality agreement requires a party not to voluntarily reveal information to other persons. In the context of mass torts, the "other persons" are often parties

to lawsuits against the settling defendant. Application of 3.[4](g) to settlements may thus have far reaching and unanticipated consequences.

7) Fair notice to the practicing bar requires that application of SCR 3.130–3.4(g) to settlement provisions should come by way of a comment to the rule (or amendment of the rule) by the Supreme Court after notice to the bar and an opportunity for litigating lawyers to provide input to the Court.

In light of this overwhelming avowal testimony, and based on my own participation, observations, and interpretation, I agree with Professor Fortune and would hold that SCR 3.130–3.4(g) was not intended to apply to confidentiality and non-cooperation provisions in settlement agreements. I would, therefore, find Unnamed Attorney not guilty of violating SCR 3.130–3.4(g). Moreover, on the equities, I don't believe we should seek approval of a rule on the basis it is one thing and then penalize Kentucky attorneys by now holding it is something else! If for no other reason, equity should have a play here.

For the foregoing reasons, I concur in part and dissent in part, and would find Unnamed Attorney not guilty of violating SCR 3.130–3.4(a) and –3.4(g).

CUNNINGHAM, J., joins.